## ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| DynCorp International LLC | )  ASBCA No. 61274 |
| | ) |
| Under Contract No. FA8617-12-C-6208 | ) |

APPEARANCES FOR THE APPELLANT: Gregory S. Jacobs, Esq.
Erin L. Felix, Esq.
Polsinelli PC
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Jeffrey P. Hildebrant, Esq.
Air Force Deputy Chief Trial Attorney
Jason R. Smith, Esq.
Lt Col Byron G. Shibata, USAF
Trial Attorneys

### OPINION BY ADMINISTRATIVE JUDGE SWEET

This appeal requires us to decide who should bear the cost of a latent error in an enormous third-party data-set provided by the government to prospective offerors to allow them to develop their pricing—which the government aptly characterizes as "a needle in a hay field" (tr. 1/23). The Board conducted a two-day hearing on entitlement. For the reasons stated below, we hold that the government should bear that cost because there was a mutual mistake that the data-set was accurate.

### FINDINGS OF FACT

*I. Background*

1. The T-6 Texan II is a training aircraft used at multiple military bases (R4, tab 203 at 1). The T-6 aircraft comes in two model configurations—the T-6A, and the T-6B (tr. 1/40-41, 1/107).

2. During the relevant time, Naval Air Station Pensacola (Pensacola) only fielded T-6A aircraft. Conversely, nearby Naval Air Station Whiting Field (Whiting Field) only fielded T-6B aircraft. (Tr. 1/43)

*II. Solicitation, Offer, and Award*

3. The government issued Request for Proposals FA8617-11-R-6208 for Contractor Operated and Maintained Base Supply (COMBS) Services for T-6 aircraft at various bases, including Pensacola and Whiting Field (COMBS II RFP) (R4, tab 202). The COMBS II RFP was to ensure that parts were available on-site when needed to maintain the T-6 aircraft (tr. 1/40). The solicitation provided estimates of flight hours, which showed a projected increase in flight hours at Whiting Field (R4, tab 176 at 35).

4. The COMBS II RFP contained seven Contract Line Item (CLIN) series. Relevant to this appeal is the 3XXX CLIN series, which involved firm fixed pricing based upon a fixed Cost Per Flight Hour (CPFH) rate at each base (R4, tab 202 at 55-81). Pursuant to that pricing structure, the amount paid would be determined by multiplying the agreed-upon fixed CPFH rate for the base by the variable number of hours flown at that base (tr. 1/41-42).

5. As the government conceded, potential offerors needed historic parts usage data[1] from the COMBS I incumbent contract for the T-6 aircraft to calculate their CPFHs (tr. 1/234, 2/8-9, 2/25-26; R4, tab 204 at 46). Therefore, the government provided potential offerors—via a Bidder's Library—Contract Data Requirement List (CDRL) A002 Reports (Usage Reports), which the incumbent subcontractor L3 Vertex (L3) had created to capture historic usage date (tr. 2/25-27; supp. R4, tab 7). In total, the provided Usage Reports contained hundreds of thousands of rows of data (R4, tabs 19-28, 30-32, 35, 41-44). The Usage Reports did not contain a disclaimer as to their accuracy (R4, tabs 19-28, 30-32, 35, 41-44). Nor is there an indication in the COMBS II RFP that potential offerors assumed the risk of any errors in the usage data (*id.*; R4, tab 202).

6. The First Quarter (Q1) 2010 Usage Report contained 18,930 rows of data, including the following entries for the following parts (Disputed Parts):[2]

| Part # | Base | Material Description | Aircraft | Issue Date |
|--------|------|----------------------|----------|------------|
| 100-602571-000 | 428 | Multifunctional Display Unit | N166014 | 01/08/10 |
| 4420-000 | 428 | Audio Management Unit | N166010 | 01/27/10 |
| 4420-000 | 428 | Audio Management Unit | N166012 | 02/02/10 |
| 100-602579-000 | 428 | Video and Transfer Recorder Unit | N166014 | 02/04/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166013 | 02/08/10 |
| 066-01143-2101 | 428 | Transponder, Mode-S (MST-67A) | N166013 | 02/09/10 |

---

[1] Parts usage—or consumption—describes how frequently a part fails (tr. 2/26).

[2] We refer to other usage reports besides the Q1 2010 Usage Report as "Other Usage Reports."

| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166017 | 02/18/10 |
|---|---|---|---|---|
| 100-602571-000 | 428 | Multifunctional Display Unit | N166013 | 02/23/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166011 | 02/24/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166013 | 02/24/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166015 | 02/26/10 |
| 5520-004 | 428 | Audio Selector Panel, AFT Cockpit | N166010 | 03/02/10 |
| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166014 | 03/05/10 |
| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166017 | 03/05/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166013 | 03/09/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166014 | 03/09/10 |
| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166018 | 03/09/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166018 | 03/12/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166022 | 03/19/10 |
| 4420-000 | 428 | Audio Management Unit | N166010 | 03/23/10 |
| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166019 | 03/26/10 |
| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166020 | 03/26/10 |
| 100-602573-000 | 428 | Integrated Avionics Computer (CMA-5000) | N166021 | 03/26/10 |
| 4420-000 | 428 | Audio Management Unit | N166023 | 03/26/10 |
| 100-602571-000 | 428 | Multifunctional Display Unit | N166015 | 03/29/10 |

(R4, tab 42, rows 16,777, 16,994, 17,080, 17,193, 17,231, 17,271, 17,392, 17,445, 17,506, 17,513, 17,563, 17,652, 17,780, 17,781, 17,776, 17,779, 17,852, 17,901, 18,055. 17,898, 18,200, 18,241, 18,340, 18,242, 18,106) Under the Base column, 428 corresponded to Pensacola, and 423 corresponded to Whiting Field (tr. 1/50, 1/53). Therefore, according to the Q1 2010 Usage Report, the Disputed Parts' base was Pensacola (*id.*).

7. Karl Heidrich—a COMBS II program manager for the government—testified that he thought that the Usage Reports were accurate (tr. 2/29). Likewise, William Harlin—the Director of Supply Chain for the Aviation Business Unit for appellant DynCorp International LLP (DynCorp), who developed the CPFHs—testified that he believed that the Usage Reports were accurate. Given his responsibility for developing DynCorp's CPFHs, Mr. Harlin had an adequate basis for testifying about DynCorp's belief regarding the accuracy of the Usage Reports that he used to develop the CPFHs. Therefore, we find that DynCorp also believed that the Usage Reports were accurate. (Tr. 1/162)

3

8. However, the Q1 2010 Usage Report erroneously indicated that the Disputed Parts' base was Pensacola, when in fact the Disputed Parts' base was Whiting Field. Bobby May, Jr.—an L3 logistics manager who was involved in creating subsequent Usage Reports (tr. 1/234-35)—testified that the underlying usage data had been stored in an SAP database, from which an L3 employee exported and formatted the usage data to create the Usage Reports. Mr. May testified that, in the course of this litigation, he examined the underlying SAP data for Q1 2010. That examination revealed that the Disputed Parts' base listed in the Q1 2010 Usage Report deviated from the Disputed Parts' base identified in the SAP data. (Tr. 1/237-40) As a result, Mr. May gave the following answers to the following questions at the hearing:

Q.  Yea, what does [the conflict between the Q1 2010 Usage Report and the SAP database] tell you about the location information that was in the Bidder's Library?

A.  For [Q1 2010] and [Pensacola], it appears to have been flip flopped.

Q.  What do you mean when you say, "flip flopped"?

A.  When the data is exported from SAP, it has to be formatted to get into the correct format for submittal. And it appears for that site location, 423, 428, that the numbers were switched.

....

Q.  So what does that lead you to conclude regarding the transaction, say, 423 in your system and, say, 428 in the Bidder's Library?

A.  It leads me to believe that the—when the information was exported out of SAP index, that in the formatting of the data for that quarter was done that the individual that did that inadvertently switched those two site location numbers.

Q.  That would make the locations incorrect for those transactions, correct?

A.     For those transactions, for that one quarter, for that site.

(Tr. 1/240-42) Mr. May testified that he verified that there had been no changes within the SAP system (tr. 1/241). In light of his role at L3, his examination of the SAP data, the fact that his testimony was against his company's interest, and our observations of Mr. May at the hearing, we conclude that Mr. May was credible. Thus, we find that the Q1 2010 Usage Report erroneously indicated that the Disputed Parts' base was Pensacola (Base 428), when in fact the Disputed Parts' base was Whiting Field (Base 423).

9. While Mr. May admitted that he was "speculating" that the reason for the errors was that L3 miscoded Base 423 as Base 428, he did not testify that he was speculating regarding the existence of those errors. Mr. May presented no testimony as to whether the Usage Reports for other quarters besides Q1 2010 (Other Usage Reports) were accurate. (Tr. 1/234-43, 1/253)

10. Mr. Heidrich speculated that the Q1 2010 Usage Report may have been accurate because a T-6B visiting Pensacola for a photo-op or maintenance training could have received parts from Whiting Field (tr. 2/30-31). However, Mr. Heidrich admitted that he does not have any evidence that that actually happened (tr. 2/31). Therefore, we find that Mr. May's well-founded testimony regarding the errors is more credible than Mr. Heidrich's speculation.

11. DynCorp did not notice the errors in the Q1 2010 Usage Report because of the massive amount of data in the Usage Reports (tr. 1/162-63). Mr. May testified that it was unlikely that a contractor would have noticed the errors, given the amount of data in the Usage Reports (tr. 1/260-61).

12. DynCorp relied upon the Q1 2010 Usage Reports to prepare its CPFH proposals (tr. 1/161). In particular, DynCorp used the following formula to calculate a CPFH for each base:

$$\frac{(\text{Parts Usage From Usage Reports}) \times (\text{Cost for Parts Used From Suppliers})}{(\text{Number of Flight Hours for Historic Quarter})}$$

(Tr. 1/154-56) Jeffrey Roth—DynCorp's senior director of Aircraft Engineering and Logistic Services, who oversaw the contract at issue here—testified that the Usage Report's errors caused DynCorp to calculate a CPFH that was lower than it would have been absent the errors by decreasing the Parts Usage From Usage Report at Whiting Field in the numerator of the above equation (tr. 1/55).[3] While there were relatively few Disputed Parts,

---

[3] While Mr. Roth conceded that the errors also resulted in a CPFH that was too high for Pensacola, the effects were not off-setting because Whiting Field had significantly more flight hours than Pensacola (tr. 1/55-56).

5

the errors had a significant impact upon the Whiting Field historic usage data—and therefore upon the Whiting Field CPFH—because the Disputed Parts were high-cost parts (tr. 1/55-56).

13. In addition to the Usage Reports, the government provided potential offerors the following information pre-award:

- The flight hours for each base (R4, tab 3).

- The flight hours for each aircraft tail number (R4, tab 36).

- A T-6 aircraft Beddown Schedule (Beddown Schedule) showing the current and projected quantities of T-6A aircraft and T-6B aircraft at each base. (R4, tab 33)

- A map showing that the number of T-6B aircraft at Whiting Field would increase from 37 to 149 (R4, tab 205 at 3).

- A list of parts unique to the T-6B aircraft (Parts List) (R4, tab 64).

14. The flight hours data showed that the T-6B aircraft flight hours increased after their introduction in 2009 or 2010 (R4, tab 36; tr. 1/107-08). The Beddown Schedule showed only T-6A aircraft would be stationed in Pensacola, and only T-6B aircraft would be stationed at Whiting Field (*id.*). A comparison of that list to the Q1 2010 Usage Report shows that all of the Disputed Parts were for the T-6B aircraft (*compare id.* to R4, tab 42, rows 16,777, 16,994, 17,080, 17,193, 17,231, 17,271, 17,392, 17,445, 17,506, 17,513, 17,563, 17,652, 17,780, 17,781, 17,776, 17,779, 17,852, 17,901, 18,055. 17,898, 18,200, 18,241, 18,340, 18,242, 18,106).[4]

15. Prior to the submission of proposals, the government answered several questions from potential offerors. Specifically, the government gave the following answer to the following question:

Q38: How granular will the usage data be? For example, will it be per base? By fleet? Since all metrics are at the base level, could data be given at the base level?

A38: Data will be as detailed as possible. Currently, the [government] intends to provide demand data by base for

---

[4] In particular, the government raises arguments about the 133-430137-5, 50-910033-3, and NAS75-5-012 parts (gov't post-hearing br. at 9-10, 24). However, those parts were in the Other Usage Reports (finding 6). As discussed below, we reject any claim regarding those Other Usage Reports. Therefore, we need not address those parts.

6

the last two years. Note that the fleet is growing and therefore that will have to be accounted for in your calculations.

(R4, tab 204 at 46) The government also gave the following answer to the following question:

> Q60: Who is responsible for complexities in forecasting trends (parts usage, cost)?
>
> A60: Government has considered risks for future rising demands. Ultimately, the COMBS contractor is responsible. The Government is providing what it believes is adequate data in order for offerors to effectively forecast for requirements.

(*Id.* at 56)

16. Mr. Harlin testified that the projected increase in the number of flight hours "really doesn't have a bearing on cost per flight hour by location" (tr. 1/277). The government presented no testimony to contradict Mr. Harlin's testimony.

17. On March 4, 2011, DynCorp submitted a proposal (R4, tab 192). That proposal stated—under "pricing assumptions"—that "[t]he Cost per Flight Hour is based on consumption data provided in the Bidder's Library. Pricing of CLINs 3X00-3X10 assumes the data provided is both complete and correct." (R4, tab 190 at 18)

18. On June 1, 2012, the government awarded Contract No. FA8617-12-C-6208 (COMBS II Contract) to DynCorp based upon the COMBS II RFP (R4, tab 75).

*III. Procedural History*

19. In 2014, DynCorp noticed that it was losing money on the COMBS II Contract, particularly at Whiting Field. After investigation, DynCorp discovered the Q1 2010 Usage Report errors. (Tr. 1/50-54)

20. On December 10, 2014, DynCorp submitted an initial certified claim (R4, tab 65a). On May 12, 2015, it submitted a final certified claim, which it revised on October 12, 2015 (R4, tabs 66-67).

21. Based upon a deemed denial of that claim, DynCorp filed this appeal.

DECISION

DynCorp is entitled to reformation of the COMBS II Contract Whiting Field and Pensacola CPFHs because it has shown, by clear and convincing evidence, that there was a mutual mistake regarding the accuracy of the Q1 2010 Usage Report DynCorp used to create those CPFHs. A party is entitled to reformation of a contract if it can show, by clear and convincing evidence, that: (1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect upon the bargain; and (4) the contract did not put the risk of the mistake upon the party seeking reformation. *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990); *SRM Mfg. Co.*, ASBCA No. 44750 *et al.*, 96-2 BCA ¶ 28,487 at 142,264. As discussed below, DynCorp has satisfied its burden of showing each of those elements.[5]

*I. The Parties Were Mistaken in Their Belief that the Q1 2010 Usage Report Was Accurate*

DynCorp has shown, by clear and convincing evidence, that the parties were mistaken in their belief that the Q1 2010 Usage Report was accurate. A mistake is a belief that is not in accord with the facts. RESTATEMENT (SECOND) OF CONTRACTS § 151 (1981). Here, the parties believed that the Q1 2010 Usage Report was accurate, as demonstrated by the facts that Mr. Heidrich and Mr. Harlin testified that they believed that the Usage Reports were accurate, DynCorp's proposal stated that it assumed that the Usage Reports were accurate, and DynCorp relied upon the Usage Reports to calculate its CPFHs (findings 7, 12, 17). That belief was not in accord with the facts. Mr. May persuasively testified that the Q1 2010 Usage Report inaccurately indicated that the Disputed Parts' base was Pensacola, when the underlying SAP data showed that the base actually was Whiting Field (finding 8). Mr. May's testimony is corroborated by the fact that the Q1 2010 Usage Report and the Parts List showed that the Disputed Parts were for T-6B aircraft at Pensacola, while the Beddown Schedule showed that T-6B aircraft were not stationed at Pensacola (findings 6, 13).[6]

The government first argues that Mr. Harlin's testimony is not clear and convincing evidence that DynCorp believed that the Usage Reports were accurate because Mr. Harlin

---

[5] Because we find that there was a mutual mistake, we do not address DynCorp's alternative defective specification claim.

[6] While DynCorp asserts in its post-hearing brief's proposed findings of fact that there also were errors in the Other Usage Reports (app. post-hearing br. at 9-10), it only argues in its discussion section that the Q1 2010 Usage Report was inaccurate (*id.* at 19-22). To the extent DynCorp is asserting that there were errors in the Other Usage Reports, it has failed to provide clear and convincing evidence of such errors because Mr. May only testified that the Q1 2010 Usage Report was inaccurate (finding 9).

did not testify as a corporate representative (gov't post-hearing br. at 31-32). However, the government does not—and cannot—cite any authority requiring corporate representative testimony in order to establish a company's beliefs (*id.*). On the contrary, given his role in developing DynCorp's CPFHs, Mr. Harlin had an adequate basis for testifying about DynCorp's beliefs regarding the accuracy of the Usage Reports that he used to develop the CPFHs for DynCorp (finding 7).

Second, the government argues that DynCorp's statement in its proposal that it assumed that the Usage Reports were accurate is not clear and convincing evidence that DynCorp believed that the Usage Reports were accurate because we purportedly found that that statement lacked credibility in *DynCorp International, LLC*, ASBCA No. 59244, 17-1 BCA ¶ 36,653 at 178,497-98 (*DynCorp I*) (gov't post-hearing br. at 39). We already have rejected that argument in denying the government's collateral estoppel summary judgment motion in this appeal. *DynCorp International, LLC*, ASBCA No. 61274, 18-1 BCA ¶ 37,011 at 180,247 (*DynCorp II*). As we held in *DynCorp II*, *DynCorp I* merely found that DynCorp knew that the usage data was *incomplete*, which is distinct from the issue in this appeal of whether the usage data was *accurate*. (*Id.*) *DynCorp I* made no finding regarding the accuracy of the usage data. (*Id.*) Therefore, the government's suggestion that *DynCorp I* precludes us from finding that DynCorp believed that the consumption data was accurate is meritless.

Third, the government argues that Mr. May's testimony that the Q1 2010 Usage Report was inaccurate is not reliable because Mr. May did not create the Q1 2010 Usage Report (gov't post-hearing br. at 29-30). We disagree. The reason Mr. May's testimony is reliable is not because he based it upon his experience creating the Q1 2010 Usage Report. Rather, his testimony is reliable because Mr. May—the L3 logistics manager currently responsible for creating Usage Reports from the SAP database—based it upon his comparison of the underlying SAP data with the Q1 2010 Usage Report. That comparison showed that the Q1 2010 Usage Report deviated from the underlying SAP data. (Finding 8)

Fourth, the government argues that Mr. May's testimony is not reliable because he based his testimony upon the same SAP database used to generate the erroneous Q1 2010 Usage Report (gov't post-hearing br. at 30). That argument improperly conflates the SAP database housing the underlying data, and the Usage Reports generated based upon that data (finding 8). There is no evidence of an error in the underlying SAP data (finding 8). Rather, the error was in the Q1 2010 Usage Report that L3 generated based upon that data because the Q1 2010 Usage Report deviated from the underlying SAP data (finding 8).

Fifth, the government argues that Mr. May's testimony that the Q1 2010 Usage Report was inaccurate is not reliable because he admitted that he was only speculating regarding the reason for the Q1 2010 Usage Report errors (gov't post-hearing br. at 29-30). That argument improperly conflates the existence of errors (*i.e.*, that the Q1 2010 Usage Report indicated that the Disputed Parts' base was Base 428, instead of Base 423) with the

9

reason for those errors (*i.e.*, because L3 miscoded Base 423 as Base 428). While Mr. May testified that he was speculating regarding the reason for the Q1 2010 Usage Report errors, he did not testify that he was speculating regarding the existence of those errors (finding 9). Regardless of the reason for the errors, Mr. May's well-founded testimony that there were errors in the Q1 2010 Usage Report establishes that the parties' mistakenly believed that the Q1 2010 Usage Report was accurate.

Sixth, the government argues that the fact that the Q1 2010 Usage Report and the Parts List showed that the Disputed Parts were for T-6B aircraft based at Pensacola, while the Beddown Schedule showed that T-6B aircraft were not stationed at Pensacola, does not corroborate Mr. May's testimony because the Q1 2010 Usage Report does not define the term "base" (gov't post-hearing br. at 26). That argument is also meritless. Language must be given the meaning that would be derived from the language by a reasonably intelligent person acquainted with the contemporaneous circumstances. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965). Here, a reasonably intelligent person would derive from the contemporaneous circumstance of the government posting the Usage Report and the Beddown Schedule together in the Bidder's Library that the term "base" in the Usage Reports had the same meaning as the beddown location in the Beddown Schedule (findings 5, 13).[7] However, the Beddown Schedule indicated that T-6B aircraft were not located at Pensacola, while the Q1 2010 Usage Report and the Parts List showed that T-6B parts were used on aircraft located at Pensacola (findings 5, 13). It is that inconsistency that corroborates Mr. May's testimony that the Q1 2010 Usage Report was inaccurate.

In sum, none of the government's arguments have merit, and DynCorp has shown by clear and convincing evidence that the parties mistakenly believed that the Q1 2010 Usage Report was accurate.

---

[7] Because we find that the term "base" was not ambiguous, we need not—and do not—address the government's patent ambiguity argument (gov't post-hearing br. at 26). To the extent that the government is arguing that the inconsistency between the Q1 2010 Usage Report and the Beddown Schedule was patent, that argument would be meritless. A patent ambiguity is one that is so glaring that it is unreasonable for a contractor not to discover and inquire about it. A contractor need not inquire about more subtle ambiguities. *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997). Here, given the massive amounts of data in the Usage Reports, we conclude that it was reasonable for DynCorp to overlook the inconsistency between a few rows of data in one Usage Report and the Beddown Schedule (findings 5-6, 11). Because that was a subtle inconsistency, it was latent and did not trigger a duty to inquire. In any event, a contractor's negligence in failing to ascertain the correctness of information does not defeat a mutual mistake claim. *Southwest Welding & Mfg. Co. v. United States*, 373 F.2d 982, 991 (Ct. Cl. 1967).

*II. The Mistaken Belief that the Q1 2010 Usage Report Was Accurate Constituted a Basic Assumption Underlying the COMBS II Contract*

DynCorp has shown, by clear and convincing evidence, that the mistaken belief that the Q1 2010 Usage Report was accurate constituted a basic assumption underlying the COMBS II Contract. A belief constitutes a basic assumption underlying a contract if it is a significant part of the bargaining process. *Comshare, Inc.*, ASBCA No. 49284, 98-1 BCA ¶ 29,588 at 146,674. Here, the parties' belief that the Q1 2010 Usage Report was accurate was a significant part of the bargaining process because of the significant role the usage data in the Q1 2010 Usage Report played in calculating the CPFH pricing. The usage data was one of the three factors that DynCorp used to calculate its CPFH (finding 12). As a result, DynCorp expressly stated in its proposal that its pricing for the 3XXX CLINs "is based on [usage] data provided in the Bidder's Library," and that DynCorp "assumes the data provided is...correct" (finding 17). Likewise, the government conceded that potential offerors needed usage data to calculate CPFHs (finding 5). Because of the significant role the usage data played in the CPFH calculations, the mistaken belief that that data was accurate constituted a basic assumption underlying the COMBS II Contract.

The government argues that the projected increase in flight hours at Whiting Field also should have played a significant role in calculating the Whiting Field CPFH (gov't post-hearing br. at 33, 37-38). However, Mr. Harlin testified that an increase in the number of flight hours does not "have a bearing on the CPFH by location" (finding 16). That testimony is persuasive because the CPFH is a fixed *rate per flight hour*, which is multiplied by the variable number of flight hours (finding 4). Thus, the number of flight hours component of the pricing formula—and not the CPFH component—accounts for the projected increase in flight hours. Moreover, the government presented no testimony to contradict Mr. Harlin's testimony (finding 16). Instead, the government points to its responses to questions, in which it indicated that potential offerors were responsible for the complexities of forecasting parts usage costs, and that potential offerors' calculations had to account for fleet growth (gov't post-hearing br. at 36-37 (quoting finding 15)). However, those general responses do not assert that an increase in the number of flight hours impacts the CPFH, let alone contain an explanation of how increased flight hours purportedly impact the CPFH (finding 15). Thus, those responses do not persuasively contradict Mr. Harlin's testimony that the projected increase in flight hours did not impact the CPFH.

In any event, even if the projected increase in flight hours should have played a significant role in the Whiting Field CPFH calculation that would not negate the fact that the usage data also played a significant role in the CPFH calculation. That is because multiple factors played a significant role in the CPFH calculation (finding 12). Since the usage data in the Q1 2010 Usage Report was one of those factors that played a significant role in the CPFH calculation, the mistaken belief that the Q1 2010 Usage Report was accurate constituted a basic assumption underlying the COMBS II Contract.

11

*III. The Mistaken Belief that the Q1 2010 Usage Report Was Accurate Had a Material Effect upon the Bargain*

DynCorp has shown, by clear and convincing evidence, that the mistaken belief that the Q1 2010 Usage Report was accurate had a material effect upon the bargain. A mutual mistake has a material effect if the resulting imbalance in the agreed exchange is so severe that the contractor cannot fairly be required to carry it out. *MPT Enter.*, ASBCA Nos. 25339, 25834, 83-2 BCA ¶ 16,761 at 83,336-37. That is, the mutual mistake must adversely affect the contractor's reasonable expectations. (*Id.*)

Here, the mistaken belief that the Q1 2010 Usage Report was accurate adversely affected DynCorp's reasonable expectation regarding pricing. While the number of errors was small relative to the overall size of the data-set, those errors had a significant impact upon the Whiting Field historic usage data because the errors concerned high-cost parts (finding 12). Moreover, the resulting errors in the historic usage data had a significant impact upon the Whiting Field CPFH because historic usage data was a substantial factor in calculating CPFH (finding 12). Because the mistaken belief adversely affected DynCorp's reasonable expectations, the resulting price imbalance was so severe that DynCorp cannot fairly be required to perform at that price. Thus, the mistaken belief that the Q1 2010 Usage Report was accurate had a material effect upon the bargain.

*IV. DynCorp Did not Assume the Risk that the Q1 2010 Usage Report Was Accurate*

DynCorp has shown, by clear and convincing evidence, that it did not assume the risk that the Q1 2010 Usage Report was accurate. While the fact that a contract is a fixed-price contract may suggest that the contractor assumed the risk of an error in that pricing, that fact does not necessarily prove that conclusion. *Nat'l Presto Indus., Inc. v. United States*, 338 F.2d 99, 109 (Ct. Cl. 1964). Rather, "[w]e are...admonished, in the region of mutual mistake, to seek just solutions." (*Id.* at 111 (citation omitted))

Here, while the COMBS II Contract was a fixed-price contract, the government provided DynCorp with the erroneous Q1 2010 Usage Report to allow DynCorp to develop its pricing, and that report contained no disclaimer as to its accuracy (finding 5). Indeed, there was no indication in the contract documents that DynCorp assumed the risk of any errors in the Usage Reports (finding 5). Faced with the situation where neither party knew—or should have known—of a latent error in data provided by the government, and the contract did not explicitly assign the risk of error to either party, the just solution is to allocate that risk to the relatively more culpable party best placed to mitigate the risk. Here, that would be the government because it provided the Usage Reports to DynCorp

12

(finding 5). Therefore, we find that DynCorp did not assume the risk that the Q1 2010 Usage Report was accurate.[8]

CONCLUSION

On entitlement, the appeal is sustained. Accordingly, the appeal is returned to the parties for a determination of quantum consistent with this decision.

Dated: August 1, 2019

_James R. Sweet_

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[8] The government points to other data in the Bidder's Library, which was accurate (gov't post-hearing br. at 40-41). However, whether other data was accurate has no bearing upon the issue of whether the Q1 2010 Usage Report was accurate, let alone whether DynCorp assumed the risk of any inaccuracy.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61274, Appeal of DynCorp International LLC, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
